# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | | |
|---|---|---|
| _____ | : | |
| JASON HINSON, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 5:17-CV-0260 |
| | : | |
| v. | : | |
| | : | |
| KYLE MARTIN, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**EXPERT REPORT OF ERNEST BURWELL**

Dated: November 18, 2022

## INTRODUCTION

I have been retained to review and render opinions regarding an incident related to unlawful use of force by Kyle Martin, a DeSoto Parish Sheriff Deputy, on Jason Hinson.

When police canines are used as a use of force to a human, there is no scientific method available to evaluate the police canine other than using generally accepted practices, knowledge, and training of an experienced canine trainer and handler, and using audio and video of the canine team's past and previous use of force incidents, including accidental bites to non-suspects.

I am being compensated for my time at an hourly rate of $300 for case review, consulting, and writing of expert opinions and $350 for deposition and trial testimony.

## MATERIALS CONSIDERED

During the course of my review, I have studied the reports, photographs, videos, and other material provided to me regarding this case. Specifically, I have reviewed:

1. May 13, 2018 Declaration by Jason Hinson (D.I. 38.02);
2. Hinson v. Arbuckle, et al. Complaint (D.I. 1) and Amended Complaint (D.I. 3);
3. DeSoto Parish Sheriff's Office Incident Report from February 22, 2016 (DEF 1-4);
4. Kyle Martin's Police Dash Cam Video of the incident (DEF 1916);
5. Certified Transcript of Kyle Martin's Police Dash Cam Video of the incident (HINSON 00000001-00000038);
6. Joe West's Police Dash Cam Video of the incident (DEF 1917);
7. Seven (7) color photographs of Mr. Hinson at the time of the incident (DEF 1918-1924);
8. Fifteen (15) color photographs of Mr. Hinson's scar after the incident (DEF 2210-2224);
9. Kyle Martin's officer certifications (DEF 1926-1970);
10. Kyle Martin's Police Dash Cam Video from March 2, 2016 (DEF 1925);
11. DeSoto Parish Sheriff's Office Incident Report from January 5, 2016 (DEF 1971);
12. Case Materials from *Charleston v. Richardson* (DEF 1989-2109);
13. DeSoto Parish Sheriff's Office Use of Force and Canine Unit policies in effect on February 22, 2016 (DEF 2110-2125, DEF 2113A);
14. US K9 Unlimited January 23, 2015 Invoice and Purchase Agreement for the canine "Rex" (DEF 2126-2128);
15. DeSoto Parish Sheriff's Office Arrest and Incident Reports for Delano Owens, Armando Martinez, Kristopher Finklea, Isaac Charleston, Matthew Hinkle, Dekeldric Richardson, Kayla Murphy, and Norman Farris (DEF 2579-2664); and
16. Depositions of Kyle Martin, Jason Hinson, Aaron Anderson, Kelby Pearah, Casey Hicks, Chato Atkins, Dr. Nicholas Allen, Joe West, Justin Taylor, Landon Williamson, and Monica Cason.

If there is any additional material or information, a supplemental report may be necessary.

I have used my special knowledge and skill that will assist the trier of fact to understand the

evidence or to determine a fact in issue. Based on my extensive knowledge of police canines, skill, experience, training, and education, if called upon, I may testify thereto in the form of an opinion. I have also reviewed compiled case materials. Whenever I am brought on to assess a case, I make sure to stay up to date on legal developments on the use of police canines, especially in the Fifth Circuit. A detailed list of cases is provided in the Appendix of this report. My CV, evaluations, and certificates are attached as Attachment A to this report.

## QUALIFICATIONS

I joined the Los Angeles County Sheriff's Department on January 21, 1977 and was a Deputy Sheriff for almost 30 years. For 20 years, I was assigned to the Special Enforcement Bureau ("SEB"), which included assisting S.W.A.T. calls. I have personal knowledge and experience regarding the practices and customs of law enforcement departments, which reflect the employment and enforcement of proper training in the use of less lethal munitions and police service canines by law enforcement personnel. I hold a California Peace Officer Standards and Training ("POST") Advanced Certificate. I was a California Peace Officers Standards and Training Canine Evaluator. I have received training from Adlerhorst International Canine training and other law enforcement agencies.

Throughout my career with the Los Angeles County Sheriff's Department, I received ongoing POST certified training courses on police practices regarding interactions with individuals suspected of crimes and as being mentally ill. These training programs include learning domains, from which every officer in the State of California are taught, and many are taught throughout the United States. As a Deputy Sheriff, I frequently dealt with persons intoxicated, mentally ill, under the influence of controlled substances, hostile, barricaded, any types of misdemeanor and felony suspects.

I have extensive knowledge handling calls similar to the incident involving Mr. Hinson as a field training officer, as a canine handler, as a negotiator, and as a SWAT officer.

I trained newly assigned sergeants, lieutenants, attorneys representing the department, and other oversight members regarding canine practices and training. I have certified and deployed the police service canines, taser, tear gas, pepper spray, sting balls, diversionary devices, Arwen 37mm launcher (same as the Sage), bean bag projectiles, batons, saps, carotid restraints, firearms, and other use of force instruments during arrests and attempted suicides. I have also experienced each of the aforementioned use of force instruments.

I have conducted thousands of building and area searches for suspects.

I have trained hundreds of law enforcement officers and agencies across the nation regarding best practices for police service canine teams. I have worked as a canine handler for eight different police service dogs during my twenty year career as a canine handler. I worked the Rottweiler, German shepherd, Belgian Malinois, Malinois Shepherd mix, and Belgian Travern. I am familiar with the temperament of each breed.

I have extensive knowledge and experience regarding dogs' working prey drive where it will not release a bite on command, and where other measures must be taken to get the dog off the human bite. Some of those measures include using a gag stick, electricity, squeezing the dog's testes, flanking the dog, choking the dog, and striking the dog with a hard object. I have experience with police service dogs that do not have the temperament to work as a patrol or SWAT dog. I was the canine unit statistical data manager, keeping track of bite ratios, injuries, length of time the dog bit the suspect, and other information required by supervision about the search, handler, dog, and suspect.

## PRIOR TRIAL EXPERT TESTIMONY

| | |
|---|---|
| Hammond v. County of Oakland, et al., No. 17-cv-13051-ac-drg | 2022 |
| Castro v. State of Arizona, No. 2:18-cv-00753-srb-esw | 2022 |
| Ely v. Santa Barbara County, No. 2:20-cv-06549 dmg | 2022 |
| Judge v. County of Los Angeles, No. 2:18-cv-02181-jfw (raox) | 2021 |
| O'Brien v Livingston Police Dep., No. 1:18-cv-00106-spw-tjc | 2021 |
| Donastorg v. City of Ontario, No. 5:18- cv- 00992- jgb- sp | 2021 |

## CASE BACKGROUND

Based on my review of the case materials, this case is about the deployment of a police canine by Deputy Kyle Martin of the DeSoto Parish Sheriff's Office during the apprehension and arrest of Mr. Jason Hinson on February 22, 2016. Mr. Hinson alleges that he has sustained long-term injuries from the deployment of Rex, the police canine at issue. He brought claims of excessive force in violation of his Fourth and Eighth Amendment rights. Through the judicial process, these claims have been narrowed to the question of an excessive force violation based on the Fourth Amendment. From my understanding, one of the remaining questions in this case is whether the canine was properly trained and whether Deputy Martin followed appropriate protocol after Mr. Hinson was initially subdued following the deployment of Rex.

## GENERALLY ACCEPTED POLICE SERVICE CANINE PRACTICES

The primary mission for a police service canine is for law enforcement to use the canine's superior sense of smell to locate people or things hidden. However, more and more frequently, the police dog is being used as a use of force tool for pain compliance to bite suspects even though they are passive.

Many courts have recognized that police dogs used for biting constitute a serious use of force. Many handlers are working in the times prior to the U.S. Supreme Court ruling, *Graham v Connor*, which created a test for the decision to deploy a canine. *See* the Appendix for a summary of Graham v. Connor. The dogs are not being controlled by verbal commands or restraint devices, such as leashes and electric collars.

Police service dogs are mostly that of the Belgian Malinois breed. This breed of dog is faster and more agile than other breeds like the German Shepherd or Rottweiler. Belgian Malinois police dogs are trained in Europe and then imported to the United States by dog vendors such as U.S.

Canine Unlimited and Adlerhorst International, for a variety of missions. Some of those missions are patrol, narcotics, home security, bomb detection, and personal protection.

Because the demand for dogs across the globe has increased, the supply and demand has caused dogs to be placed in service that have no business being there. The handlers are not able to control the animal once it's on a human bite and have great difficulty getting the dog off.

A dog bite may not appear serious at first; however that does not mean the bite wounds will not become infected and serious life threatening conditions result later on.

### 1. Find and Bite Police Canines

With a find and bite police canine, the attack command is contained within the "send command" to go out and search for a suspect. As soon as the handler yells out "police," the dog turns on and becomes aggressive. No other command is needed for the dog to bite whatever it finds. During the search, if the dog can get to the suspect, the dog will bite the suspect unless the handler has a visual on the dog and verbal control of the dog to stop the attack. This is true whether the dog is on or off leash. However, the dog does not always need the bite command to bite a human. For example, all police service canines are trained in "handler protection." If the canine handler grabs a suspect, the suspect grabs the handler, or even if the suspect makes a small movement, the dog reacts and bites the person to protect its handler. No command is needed from the handler because this behavior has been imprinted into the dog to respond in those circumstances.

Deputy Martin used the command "Hunt" when chasing after Hinson. This command was not a command Rex was trained with in Europe, however it is a common practice for a handler to use English commands, inflection in voice, which includes tone, pace, pitch, and modulation, or intonation of the words that come out of the handler's mouth. Martin's voice inflection on Rex was used to praise Rex for good and bad behavior. However, Martin has it backwards. As an example, he uses soft tones when the dog is biting and harsh tones when praising the dog as demonstrated when Rex was biting him on March 2, 2016. When he was walking Rex back to the patrol vehicle after biting Hinson on February 22, 2016, he told Rex over and over "good boy." Martin's behavior seemed extremely bizarre after Rex bit Hinson. He seemed particularly excited at the severity of the bite and continued to praise Rex repeatedly.

In a bite and hold method of training, the handler must have complete control over the actions of the dog. With such control, the handler can recall and restrain the dog before a bite occurs. Alternatively, the handler can quickly remove the dog from the apprehended suspect. *See Kerr v. West Palm Beach, Florida* for generally accepted practices. That same case had the Los Angeles County modify the entire training and deployment policy and most other law enforcement agencies that used dogs that would bite a human.

### 2. Bite Reports/Use of Force Reports/Incident Reports

Generally accepted practices for reports written by law enforcement officers should include all relevant details of the incident, including the following information, much of which is recommended by the International Association of Chiefs of Police. Deputy Martin did not write accurate and detailed bite reports, including bites to himself, other deputies, or suspects. The

generally accepted practice for a use of force report is to include the critical information to ensure that the chronology, specifics of the events, and the people involved are properly documented with the force they used. The purpose is for supervision to monitor misbehaving officers, civil rights violations, and assist with officer memory during trials. An officer's report must present each event or incident in a complete and clear manner. Any investigation, arrest, prosecution, use of force, injury to anyone, or other action taken must be initiated, supported, or justified by the information included in the report written by that officer.

- Date, time, and location of the deployment
- What led the officer to believe the suspect was dangerous (e.g., the crime that was involved, outstanding warrants, whether the suspect was armed)
- What factors established probable cause?
- Tactics that were employed
- Were canine announcements made, where, how long, and could the perimeter officers hear the canine announcements?
- Did the handler use the P.A. system on the patrol cars?
- Did the dog bite more than once?
- Did the dog call off with a verbal command?
- Names of all involved officers, supervisors, and witnesses
- Whether the deployment was approved by a supervisor
- Whether a search or deployment announcement was given and the language used
- The number of announcements given prior to deployment
- Time elapsed between the announcement and deployment
- Time elapsed between deployment and suspect contact
- Distance of the dog from the handler when contact was made
- Duration of contact between dog and subject
- Any commands given to the canine to release the bite
- Elapsed time between canine contact and officer's arrival at the scene
- Actions taken by the officer upon arrival at the scene of contact
- Any statements made by the suspect
- Manner in which the canine held the suspect, so that any prior injuries are not attributed to the encounter
- Copies of any witness statements
- Any photographs taken of injuries, aid rendered in response to injuries, where treatment was received and by whom

### 3. Past Incidents Involving Canine Handler Kyle Martin

The canine team must be evaluated by past and present incidents where a bite occurred to the handler, other deputies, and suspects. During my study of the documents sent to me by Plaintiff's counsel, I found that this canine team was not acting appropriately. It is important to understand

the canine team's entire history in order to properly train and supervise the canine team to act in accordance with the U.S. Constitution, State, County, department policies, and court decisions. Since there are no scientific methods to evaluate use of force, an expert must look at the canine team's performance. Rex bit Deputy Kelby Pearah on January 5, 2016 and would not release the bite on command. *See* Incident Report from January 5, 2016 (DEF 1971). Prior to biting Hinson on February 22, 2016, Rex should have been removed from the field immediately.

Mr. Hinson's version of the events occurring on February 22, 2016 are consistent with other incidents where Rex did not release the bite on its own handler and another deputy.

> a.   January 5, 2016 Bite to Kelby Pearah

Deputy Martin testified that "Rex" bit Deputy Kelby Pearah on the leg and would not release on command. This bite to Pearah caused Pearah to leave his position as back up to Deputy Martin and be taken to the hospital for injuries he sustained from Rex. *See* Incident Report from January 5, 2016 (DEF 1971). It should be noted I was unable to find a supplemental bite report from Deputy Martin regarding the bite to either himself or Deputy Pearah in the case materials, despite a requirement that one be completed in the DeSoto Parish Sheriff's Office policies on Use of Force and the Canine Unit.

> Martin Deposition (February 1, 2022), page 87:19-23:
> Q. And you've testified on that occasion Rex bit
> Mr. Pearah on the leg?
> A. Yes.
> Q. And you're telling me now that when you
> commanded Rex to release on that occasion, he did not.
> A. He did not.

Deputy Kelby Pearah's Incident Report from January 5, 2016:

> *At this time CPL Kyle Martin (K9 handler) and stonewall officer Joe Procell arrived on scene. CPL Martin deployed K9 Rex to the last known location of the driver. I went with CPL Martin to assist. We tracked through a large field then back towards the truck. We started tracking again. We came to a creek that was very steep on the other side. I told CPL Martin that I would cross and if K9 could not cross then I would hold the spot of the track. I jumped across the creek and started climbing the other side. At this time K9 Rex bit me in my right calf. CPL Martin was able to get K9 Rex off of me. SGT Gingles was able to assist me out of the woods. I had heavy bleeding and DY Galey was able to apply combat gauze to stop the bleeding. EMS was called to our location and I was transported to University Hospital and treated for injuries.*

Furthermore, Rex created an officer safety issue for the deputies by biting while searching for a suspect. Rex did not enhance officer safety at any time. If another tool was defective, such as the

duty weapon or Taser, it would immediately be taken out of service. Deputy Martin did not properly train Rex or remove him from service when he should have done so. *See* Incident Report from January 5, 2016 (DEF 1971).

    b.  <u>March 2, 2016 Bite to Kyle Martin</u>

In his deposition, Deputy Martin testified that his police service canine "Rex" bit him in the leg and would not release on command. Deputy Martin failed to write in his report that "Rex" bit him on the leg and he had to leave the search to seek medical attention after being bit. Based on my review of the dash cam video, Deputy Martin failed to include that he gave at least **twenty-two commands** to get "Rex" to release the bite. *See* Kyle Martin's Police Dash Cam Video from March 2, 2016 (DEF 1925). It is extremely rare for a police service canine to bite its own handler and even more rare to not let go of the bite on its handler. I have returned several dogs to the vendor for this type of behavior prior to allowing the dog to perform in actual searches. This incident is relevant to the incident involving Mr. Hinson because it shows that Rex consistently failed to follow commands and that Deputy Martin had no control over his canine.

> <u>Martin Deposition (February 1, 2022), page 86:20-25:</u>
> Q. While he was biting you, you gave Rex the command
> for Release, which you've told us is Los; correct?
> A. Yes.
> Q. And he didn't obey that command.
> A. No.

> <u>Martin Deposition (February 1, 2022), page 90:21-25:</u>
> Q. You drug yourself into a bathroom with Rex attached
> to your leg.
> A. Yes.
> Q. And he didn't let go?
> A. No. I wish he would have, but no.

    c.  <u>June 28, 2017 Bite to Charleston</u>

On June 28, 2017, Deputy Martin located Mr. Charleston in an almost identical search of Mr. Hinson. *See* Incident Report from June 28, 2017 (DEF 2620-2632). The Charleston case is relevant to this case because it has similar facts — both suspects fled into the woods, both suspects were bit by Rex for an extended period of time, and both suspects reached for the dog when they were bit. Deputy Martin testified that Rex bit Charleston for less than two minutes. *See* Kyle Martin Deposition in *Charleston* Case Materials (September 21, 2020), p. 16:23-25, 17:1. Deputy Martin failed to understand that a person will try to fend off an animal attack, which does not constitute resistance.

Kyle Martin's Incident Report from June 28, 2017:

> *Once he made it to the tree line he quickly dove into the woods and apprehended Charleston who was actively hiding under some bushes. Once I got to K9 Rex I could see that Charleston had rex by the head and I began telling him to stop fighting my dog and show me his hands. It took several verbal commands for Charleston to do so. Once he did l gave k9 Rex the command to release Charleston.*

<u>ANALYSIS OF THE CASE</u>

### 1.  Deputy Martin Should Have Given a Warning When Releasing Rex

Deputy Martin failed to give any canine announcements prior to or after releasing "Rex" to chase after Hinson. There was plenty of time to give announcements. According to Martin's dash cam video, Rex was immediately running towards Hinson's pregnant girlfriend and Martin had to yell numerous times for Rex to come with him so she would not get bit. *See* Kyle Martin's Police Dash Cam Video from March 2, 2016 (DEF 1925). After Rex was redirected towards the tree line, Martin had plenty of time to yell out announcements while running after Rex. Deputy Martin failed to follow generally accepted practices for canine warnings, as well as the DeSoto Parish Sheriff's Office canine deployment policy regarding announcements. *See* DeSoto Parish Sheriff's Office Canine Unit Policy, V(E)(2) (DEF 2110-2125). The policy states the following:

> In the event a search is to be conducted by the K-9 team, the K-9 handler shall be responsible for warnings to be given. . . . **In the event the handler is conducting an area or yard-to-yard search, a simple warning will be given, except in cases where such warning would create a more dangerous situation for the handler.**

There was nothing to indicate Hinson was assaultive towards the deputies or that he was actively running from anything other than a warrant for his arrest. The failure to warn was against the DeSoto Parish Sheriff's Office policy. *See* DeSoto Parish Sheriff's Office Canine Unit Policy, V(E)(2) (DEF 2110-2125).

Additionally, in the Charleston incident, Martin stated that he deployed a warning to Charleston before releasing Rex, even though Charleston had two felony warrants out for his arrest and Charleston had already fled into the woods. *See* Incident Report from June 28, 2017 at DEF 2629 (describing two felony DV abuse with a weapon warrants) and DEF 2631 (describing the warning Martin gave). Martin knew that he was required to issue a warning, and in a very similar circumstance, did do so, so there is no reason officer safety would have been a concern in Hinson's case but not Charleston's.

### 2.  Rex Bit Hinson for an Unreasonable and Extended Amount of Time

Hinson received a lengthy dog attack which led to serious injuries. Deputy Martin was covering Hinson with his duty weapon pointed at Hinson while "Rex" continued to bite him for a lengthy

time. Deputy Casey Hicks arrived shortly after Martin caught up with Hinson, but then Martin waited even more time to get Rex off of Hinson until other backup deputies arrived before commanding Rex to release. Based on the dash cam footage, approximately twenty seven seconds after Martin and Rex caught up to Hinson, Deputy Hicks arrived to the scene in the woods. *See* Kyle Martin's Police Dash Cam Video from March 2, 2016 (DEF 1925). Deputy Martin testified that he only needed one backup deputy to safely approach Hinson and remove Rex. *See* Martin Deposition (February 1, 2022), p. 128:14-25, 129:1-2.

Police Dash Cam Video



At one minute and 24 seconds, Hinson runs from his vehicle.



At one minute and 34 seconds, Deputy Martin and "Rex" chase after Hinson.



At one minute and 49 seconds, Deputy Casey Hicks arrives to assist Deputy Martin. Deputy Martin continues to command Rex to bite Hinson yelling, "STELLEN."



At two minutes and 16 seconds, Deputy Martin is heard telling the backup deputy (Casey Hicks) who arrived to the scene to "Hook him up," meaning handcuff Hinson.



At three minutes and 2 seconds, other deputies arrive and begin to run into the woods for backup. This indicates Rex was biting Hinson while Deputy Hicks was with Martin as backup, but Rex was not released until several deputies arrived.



At three minutes and 11 seconds, another deputy is running to be backup for Martin.



Deputy Martin continued to allow "Rex" to bite Hinson, even though his hands were clearly seen void of any weapons and Martin and Hicks had their firearms pointed at Hinson. The only reason Deputy Martin could not recall the dog back and continue to cover Hinson was because he was unable to control the dog verbally.

Martin testified as to the length of time of the dog attack:

> Martin Deposition (February 1, 2022), page 123:22-25, 124:1-3:
> Q. Do you have any recollection of how much time passed between your hollering for other officers to join you and one or more officers arriving?
> A. An exact? No.

12

Q. Even if not exact, your best estimate would be helpful.

**A. Less than two minutes.**

There is no use of force tool that is allowed to be used for an extended period of time, not a baton, a Taser, kicks, fist strikes, saps, bean bag shot gun, carotid restraint, projectile launchers, or a flashlight. The only exception would be a chemical irritant after effects.

With the eight different dogs I have worked with, and as a canine handler for over twenty years with over 425 bites, I cannot think of a single incident where a suspect was bit for an extended period of time. **Each bite is different, but I would estimate that canine bites last no more than 5-15 seconds**. I recently contacted several retired canine handlers from other agencies regarding when they believed a dog bite becomes unreasonable. I spoke with Officer Craig Bragdon, Burbank Police, retired, and Officer Mark Shiva, Compton Police, retired. They confirmed my opinion. LASD Commander Charles Sid Heal wrote a book regarding "Non-lethal Concepts of Force." He was in charge of the largest Sheriff's Department's Canine Unit. He reviewed hundreds of police canine bites where high risk felony suspects were bit. **He found that police canine bites lasted no more than ten seconds until the dog was released from the bite.**

It is unreasonable to permit a police dog to bite suspects who are not in complete custody but are nonetheless attempting to surrender and otherwise pose no safety risk to the officers:

> Hinson Deposition (June 18, 2018), page 46:17-22:
> Q. Gotcha. So, that's what you're saying. They had not given you any like commands of what to do yet. You just knew that that's kind of what police like you to do?
> A. I was cooperating, you know.  I threw in the towel.  I was surrendering.

> Martin Deposition (February 1, 2022), page 124:8-25, 125:1-13:
> Q. But some time passed between your calling for help and another officer arriving.
> A. Yes, sir.
> Q. During that time, however long it was, what did you do?
> A. Until somebody got there, I would have just held cover behind the tree that I was waiting for other people to get there.
> Q. You took cover behind a tree, and you trained your handgun on Hinson.
> A. I did what?
> Q. Pointed your handgun at Hinson.
> A. Yes.
> Q. Did you give the dog any commands?
> A. At that time? No.
> Q. You did not at that time give the dog the release command?
> A. No.
> Q. Tell me, again, please, why you did not do that.
> A. At that --
> Q. At that moment, yes.

A. When I initially see them, why would I not?
Q. Yes.
A. Because he's not secure.
**Q.· Was he -- and when I -- at that point, was Hinson resisting or trying to flee based on what you could see?**
**A. Hinson was laying on the ground.**
Q. Was he moving?
**A. I don't recall.**

Deputy Martin had no reason to believe that Hinson posed a threat. The fact that Hinson was suspected of committing a violent crime is not enough, standing alone, to permit a reasonable officer to characterize a suspect as an immediate threat, particularly where the suspect is surrendering and subdued.

> Martin Deposition (February 1, 2022), page 59:9-25:
> Q. Under what circumstances would it be permissible for a K-9 handler to order a dog to bite an individual who is neither fleeing nor resisting arrest?
> A. I can't really think of any.
> Q. Is it permissible for a K-9 handler to order a dog to bite an individual who is not a threat to himself or others?
> A. No.
> Q. Is it permissible for a K-9 handler to order a dog to bite an individual for the purpose of injuring that individual?
> A. Say that one more time. Is it --
> Q. Is it permissible for a K-9 handler to order a dog to bite an individual for the purpose of injuring that individual?
> A. No.

It is unnecessary to allow a dog to remain on a bite past the point of initial apprehension. A canine should be called back once a suspect has been initially bit.

**3.  The Natural Reaction to a Dog Bite**

A suspect who is prone on the ground and being attacked by a dog cannot reasonably be expected to expose his hands and unflinchingly hold them behind his back. *See* Hartsell v. San Diego.

Deputy Martin failed to understand that when a person is being bit or attacked by an animal, the person will flail around. That flailing does not constitute resistance. It is extremely hard for a person to cooperate while a dog is biting the person. *See* IACP, Los Angeles County Sheriff's Department Deployment Policy, Seattle Police Department Policy, and the Department of Justice Policy. I have personal knowledge of being bit by a police service canine.

Other policies advise that struggling with a canine is a natural reaction following a bite:

14

Department of Justice Policy:
*The policy will require that in all circumstances where a canine is permitted to bite or apprehend a suspect by biting, the handler will call off the dog at the first possible moment the canine can be safely released, taking into account that **the average person will struggle if being seized or confronted by a canine and the policy will specify that struggling alone, will not preclude the release of the canine."***

Los Angeles County Sheriff's Department; Seattle Police Department Canine Policy:
*Handlers will continue to factor into their call-off decision that the average person will struggle if being seized or confronted by a canine. **This struggling, alone, will not be cause for not calling off the canine.** Without exception, a reference to the duration of the canine's contact with a suspect shall be included in the handler's supplemental report.*

Deputy Martin did not properly respond to Hinson flailing and moving toward Rex when Rex was biting him. The natural reaction of a person being bitten by a canine is to struggle and attempt to fend off the attack. Unless the canine can be commanded to disengage in a timely manner, such struggle will normally prompt the canine to continue or even escalate the biting response and thus aggravate the potential injuries. *See* Appendix for best police canine practices regarding the reactions of a person being bit by a police dog.

Hinson received a lengthy dog attack which led to serious injuries. The injuries caused disfigurement. The injuries were caused by the dog shaking, pulling, and tugging on Hinson's arm on several different areas of the arm for an extended period of time while Mr. Hinson was laying on the ground. While Deputy Martin was standing near his patrol vehicle, he was captured on video telling Deputy West that the dog tore up Mr. Hinson. *See* Certified Transcript of Kyle Martin's Police Dash Cam Video from February 22, 2016 (HINSON 00000001-00000038); *see also* Kyle Martin's Police Dash Cam Video from February 22, 2016 (DEF 1916):

> KYLE MARTIN: That was awesome. I was worried when he couldn't see because I didn't want to stop him to track, you know?
> UNKNOWN SPEAKER: That's good.
> UNKNOWN SPEAKER: (inaudible).
> **KYLE MARTIN: He's tore up.**
> UNKNOWN SPEAKER: (inaudible).
> KYLE MARTIN: (inaudible) shouldn't run.
> UNKNOWN SPEAKER: Good job (inaudible).
> MALE SUSPECT: Please (inaudible). Please (inaudible) .
> KYLE MARTIN: Yeah.
> UNKNOWN SPEAKER: Shut the hell up, dude.

Case 5:17-cv-00260-EEF-KDM   Document 126-1   Filed 02/10/23   Page 17 of 27 PageID #: 2403

UNKNOWN SPEAKER: (inaudible).
**KYLE MARTIN: That's a bad one right there.**
UNKNOWN SPEAKER: (inaudible).
**KYLE MARTIN: That's the bad one.**
UNKNOWN SPEAKER: (inaudible).
**KYLE MARTIN: That's a bad bite there.**

**KYLE MARTIN: That's nasty.**
UNKNOWN SPEAKER: (inaudible).
**KYLE MARTIN: His arm might be broke. I mean, that's nasty. (inaudible). That's nasty. Well, I'm pumped, man. That's good work. That's all that training.**

4. **Deputy Martin Should Have Known That Rex Was Not Properly Trained and was not Responsive to his Commands**

The dog did an excellent job at chasing Hinson and taking him to the ground. What occurred after the takedown was not necessary or reasonable. According to Mr. Hinson, Deputy Martin was unable to get "Rex" to release the bite on him. According to Mr. Hinson, "Rex" bit him several times and Deputy Martin had an extremely difficult time getting "Rex" to release the second bite. *See* Hinson deposition (June 18, 2018), p. 47:2-9. Hinson's version of the events is consistent with Deputy Martin's testimony regarding other incidents where "Rex" refused to follow Martin's commands to release a bite.

Hinson Deposition (June 18, 2018), page 39:12-25, 40:1-3:
A. And that's when Kyle Martin finally was coming up there, because I was fixing to try to push the dog off of me, but I laid my hand right there. And when Kyle Martin came, that's when he hit the dog, and the dog let me go and grabbed me.
Q. Gotcha.
A. I just rolled, and when I rolled, the dog went over with me, and he was sitting there holding me.
Q. Um-hum.
A. And then when Kyle Martin hit him again, that's when he let me go and grabbed me again.
Q. Okay.
**A. And that's when he bit me the second time.**
Q. Okay.
**A. Deep. That's when he let him sit there and gnaw on me.**

Hinson Deposition (June 18, 2018), page 47:2-9:
A. Well, after the dog, they fought to get the dog off of me.

      Q. Um-hum.
      **A. He choked the dog numerous times with the choke chain.**
      Q. Um-hum.
      **A. You know, he was picking me up off the ground, trying to choke him off of me.**

My review of the documents shows Deputy Martin received a "Basic Certificate" in 2006 from the State of Louisiana Peace Officer Standards & Training Council for completing a "Certified Basic Training Course at the Caddo Parish Sheriff's Training Academy." *See* Kyle Martin Certifications (DEF 1926-1970). Other than this basic certificate, my review of the documents shows that Deputy Martin and Police Service Canine Rex received no other Peace Officers Standards and Training certifications from the State of Louisiana related to use of force or the canine unit. There are no training records produced that show any supervisor attended any of Deputy Martin's canine trainings. In Kyle Martin's 30(b)(6) deposition, he did not know the level of training or whether Rex had received appropriate certifications when they bought him from a breeder, which he should have known. *See* Kyle Martin's 30(b)(6) deposition (September 28, 2022), p. 145-148.

**Conclusion:**

Deputy Martin was promoted from a deputy Canine Handler to Lieutenant. He testifies as the person most knowledgeable for the Sheriff's department on canine policies and training. He was unable to perform the required certifications in actual field deployments. When Martin was handling Rex, there were numerous occasions where Rex would not release the bite on verbal command from a suspect. Rex was unable to be verbally outed from a bite on a human not wearing a bite suit. Deputy Martin knew of Rex's failure to release a bite on command, that Rex bit another deputy, and that Rex bit its own handler and it took 22 commands to release the bite.

Deputy Martin did not follow the generally accepted practices for post bite interviews of the suspect. Had he interviewed the suspects that were bit by Rex and completed accurate bite reports, the department would have known Deputy Martin and Rex were out of control.

Deputy Martin's use of force reports leave out important details and do not correlate with the events that took place, and Martin failed to complete supplemental reports when the dog bit him and Deputy Pearah.

## OPINIONS

1. It is my opinion the use of the canine to apprehend Hinson was a serious use of force. What occurred after police canine "Rex" located and bit Hinson was not reasonable under generally accepted standards for police canine use. Hinson testified that while he was in handcuffs, Deputy Martin was shaking the dog hollering, "good boy, get him, get him." Deputy Martin allowed "Rex" to bite Hinson while he was trying to surrender and was subdued. According to Deputy Martin's and Mr. Hinson's depositions, "Rex" bit Hinson for an extended period of time which did not comply with the standards established by the

International Association of Chiefs of Police, numerous other Police and Sheriff's Departments throughout the country, generally accepted police canine practices, and Courts of Appeals and court decisions. Deputy Martin violated the use of force policy because he used a degree of force that was not reasonable after he apprehended Hinson.

2. Deputy Martin did not write accurate and detailed bite reports, including bites to himself, other deputies, or suspects.

3. Deputy Martin failed to give any canine announcements prior to or after releasing "Rex" to chase after Hinson, despite doing so under similar circumstances in other incidents. There was plenty of time to give announcements. Deputy Martin failed to follow the DeSoto Parish Sheriff's Office canine deployment policy regarding announcements.

4. Rex did an excellent job chasing Hinson and taking him to the ground. What occurred after the takedown was not necessary or reasonable. According to Mr. Hinson, Deputy Martin was unable to get "Rex" to release the bite on him. According to Mr. Hinson, "Rex" bit him several times and Deputy Martin had an extremely difficult time getting "Rex" to release the second bite. Hinson's version of the events are consistent with Deputy Martin's testimony regarding other incidents where "Rex" refused to follow Martin's commands to release a bite.

5. According to Mr. Hinson, he was compliant as soon as the dog took him to the ground. At that point, when Deputy Martin first saw Hinson being bit, he should have recalled the dog back to his side. Deputy Martin was being backed up by Deputy Casey Hicks and both deputies had Hinson at gunpoint. Hinson was no longer resistive, he was subdued, and trying to surrender.

6. Deputy Martin was covering Hinson with his duty weapon pointed at Hinson while "Rex" continued to bite him for a lengthy time until back up arrived. Deputy Martin continued to allow "Rex" to bite Hinson even though his hands were clearly seen void of any weapons and Martin and Hicks were pointing their firearms at Hinson. The only reason Deputy Martin could not recall the dog back and continue to cover Hinson was because he was unable to control the dog verbally.

7. The injury was caused by the dog shaking, pulling, and tugging on Hinson's arm on several different areas of the arm for an extended period of time. While Deputy Martin was standing near his patrol vehicle, he was captured on his dash cam video telling Deputy West that the dog "tore up" Mr. Hinson.

8. Deputy Martin did not recognize, as he should have, that when a person is being bit or attacked by an animal, the person will flail around. That flailing does not constitute resistance. It is extremely hard for a person to cooperate while a dog is biting the person.

18

## **APPENDIX**

1. Desoto Parish Sheriff's Department Use of Force by Canine Policy 98.053

   A. Uses of specially trained police canines for Law Enforcement responsibilities constitute a real or implied use of force. In this, as in other cases, officers may only use that degree of force that appears reasonably necessary to apprehend or secure a suspect as governed by the Agency's Use of Force policy. The levels of resistance, that a subject is displaying, shall also be taken into consideration when determining what intervention option is used. The levels of resistance are as follows:
   
       a. Psychological intimidation- Non-verbal cues indicating a subject's unwillingness or threats through attitude, appearance and physical readiness.
       b. Verbal Non-compliance- Verbal responses indicating unwillingness or threats.
       c. Passive resistance- Physical actions that do not prevent an employee's attempt to control.
       d. Defensive resistance- Physical actions that attempt to prevent an employee from controlling the subject, but do not involve attempts to harm the employee.
       e. Active aggression- Physical actions of assault or battery.
       f. Lethal force assaults- Deadly force encounter.

2. Photos of Hinson After the Incident



19









3.  <u>*Graham v. Connor*, 490 U.S. 386 (1989)</u>

My understanding of *Graham*, which is a Supreme Court case providing a framework for use of a canine is as follows: The decision to deploy a canine must be based on the three prongs of the Graham test: (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest at the time.

4.  <u>Common Commands in Different Languages</u>

| ENGLISH | GERMAN | HUNGARIAN | CZECH | DUTCH |
|---|---|---|---|---|
| Walking Heel | Fuss (fooss) | Lapos (laypos) | Knoze (knosha) | Voet(GS/Volgren(mal) (foot GS)/(vulagen mal) |
| Heel | Fuss (fooss) | Lapos (laypos) | Knoze (knosha) | Voet(GS/Platz(mal) (foot GS)/(plotts mal) |
| Sit | Sitz (sits) | Uul (ool) | Setnee (set-nee) | Zit (sit) |
| Stay | Bleib (blibe) | Ot (aut) | Stui/Zustan (stew-ee) | Bliv (blive) |
| Down | Platz (plots) | Feckutch (fekootch) | Legni (Leck-knee) | Af/Afligen (off)/(off leegan) |
| Come/Here | Heir (here) | Hossam (hoe sam) /Deare (deera) | Cumnea/ Pot Sem | Hier (here) |
| Retrieve/ Fetch | Dring (bring) | Apport (apport) | Preenyes Apport | |
| Jump | Hopp (hop) | Hop (hope) | Hop (hope) | Hoog (hook) |
| Track Then | Such – Gib (soog-gip) | Kerecht (kerecht) | Leday (lehday) | Zoek |
| Bite | Packen (pocken) | Azas (atzsas) | Drz (dursh) | Stellen |
| Out/Let Go | Aus (ous) | Erest (airest) | Poest (post) | Los |
| Seek | Such (soog) | Kerecht Apport (Kerecht apport) | Leday/Sook | Zoeken |
| Building/ Blind Search | Voran/ Revier | Furkessz | Revir (revere) | Revir (revere) |
| Kennel/ Crate | Zwinger/ Box | Kennel | Kotec | Kennel |
| Good Boy | Gut Brav (goot-brav) | Yolvan Kutya (Yolvan kutya) | Hodny (hout nee) | Braff (bra-ff) |
| Correction Word "No" | Nein (nine) | Nem (nem) | Fooy/Nesmich (fooey/nesmich) | Fooy (fooey) |
| Don't do that! | Lass das sein | Nem Szabad | Euj (pfui) | Nee |
| Article Search | Such Verloren | Keresd | Hledej Oznac | Zoek |

5.  <u>Additional Materials Used to Render Opinions</u>

I also keep up to date on relevant legal updates in this area of law, and have reviewed the following cases, policies, and guides in rendering my opinion. The opinions and analyses are based on my own understanding of the below materials.

The Marshall Project https://www.themarshallproject.org/2020/12/14/police-use-painful-dog-

bites-to-make-people-obey
TacticalK9USA.com
"Time on a Bite" by Bill Lewis, TacticalK9USA, http://www.tacticalk9usa.com/time-on-a-bite/
Member of Sheepdog Guardian
#559 Law Enforcement Canines Update Part I
#560 Law Enforcement Canines Update Part II
IACP Canines Paper 2001
IACP Canine Model Policy 2001
2015 IACP Canine Policy
2015 IACP Canine Paper
LASD Commander Charles Sid Heal's book regarding "Non-lethal Concepts of Force"
Alicea v City of Hammond, No. 15-1255, Seventh Circuit.
Lowry v. City of San Diego, 818 F.3d 840
Cooper v. Brown 2016 U.S. App. 5th Cir. 12-27-16
Graham v. Connor, 490 U.S. 386 (1989)
Hammond v. Oakland County, No. 3:17-cv-13051
Kerr v. City of West Palm Beach, No. 87-5837 (1989)
Malone v City of Fort Worth, Texas Civil Action No. 4:09-CV-634-Y 2018
Vette v. Sanders, No. 20-1118, Tenth Circuit (2021)
Edwards v. Shanley, 666 F.3d 1289 (11th Cir. 2012)
Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000)
Lowry v. City of San Diego, 818 F.3d 840
Dennen v. City of Duluth, 350 F.3d 786 (8th Cir., 2003)
Vathekan v. Prince George's County, 154 F.3d 173 (4th Cir. 1998)
U.S. v. Mohr, 318 F.3d 613 (4th Cir. 2003)
Leerburg Enterprises Canine Training Videos 2006
Ken Wallentine's Book "K9 Handlers Survival Guide
Von Liche Kennels Handler Training Manual
Executive Summary of Metropolitan Police Department, District of Columbia, Washington DC
Mesloh Florida Study on Canines
https://www.justice.gov/usao-nj/pr/atlantic-city-police-officer-charged-civil-rights-and-other-offenses Sterling Wheaten, 34, of Mays Landing, New Jersey, violating an individual's civil rights and one count of falsifying a record for submitting a false police report about the assault (U.S. Magistrate Judge Joel Schneider Police).
Canine Policies written by Lexipol for numerous law enforcement agencies
Numerous Police Canine Videos showing the dog biting a human, taken via body camera, citizen videos, or dash cam videos.
Numerous law enforcement agencies Use of Force Guidelines
Adlerhorst International Canine Training I received on nine separate occasions
Adlerhorst International Training Manual-50 pages
Criteria for Police Dog Certifications
My experience and training
Cases I have opined on
My experience as a POST canine team evaluator
Member of Legal Opinions and K9 Updates by Terry Flick
U.S. Department of Justice, Civil Rights Division, Inglewood CA PD 12/28/2009

U.S. Department of Justice, Civil Rights Division OHIO

The IACP 2001(International Association of Chiefs of Police)
The natural reaction of a person being bitten by a canine is to struggle and attempt to fend off the attack. Unless the canine can be commanded to disengage in a timely manner, such struggle will normally prompt the canine to continue or even escalate the biting response and thus aggravate the potential injuries. By comparison, many police agencies permit officers to deploy police canines in situations that fall short of the above situations, as for example when permitting canines to bite passively hiding suspects. The term refers here to individuals who generally have no known history or suspicion of being violent or who have no known serious criminal histories, where there is no reasonable suspicion that the person is armed and/or violent (for instance, hands are visible and there is no suggestion of a hidden weapon or intent to fight) but who, for a variety of possible reasons (intoxication, drug impairment, mental illness, and so on) are not compliant. Again the decision to deploy a canine must be based on the three prongs of the Graham test (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3)whether the suspect is actively resisting arrest or attempting to evade arrest at he time [emphasis added]. Consider the consequences of using a level of force similar to that of a canine, such as a Taser® or nightstick, to gain compliance of a passively hiding suspect. Such an act would normally be regarded as a use of excessive force, unless the situation was altered by other factors. Yet the deployment of a canine under the same circumstances is regarded by some agencies as a practical and reasonable means of finding and extracting such non-compliant individuals even though such deployment will likely result in some injury to the suspect. The deployment of a police canine for apprehension of a suspect is a use of force that must be consistent with this agency's use of force policy. The industry standards of care throughout this nation teach that a deployment of a police canine constitutes the use of a high level of force that should be reserved for situations that justify this response alternative. The bite of a police canine will normally cause harm to the suspect and can cause significant injury. Therefore, deployment of canines should not be performed on a routine or casual manner without objectively reasonable grounds. In assessing the reasonableness of a use of force involving a canine, courts also consider whether warnings and an opportunity to surrender were provided, as well as whether the bite was of a reasonable duration and severity.

DOJ PRINCIPLES FOR PROMOTING POLICE INTEGRITY January 2001
The use of a canine to attempt to apprehend or seize a civilian is a use of force. Special precautions are required to ensure that such force is not used unnecessarily or unreasonably. A canine should be deployed to apprehend or seize an individual only where:
(a) the individual is suspected of having committed a serious or violent felony,
(b) less potentially injurious techniques are insufficient, and
(c) unless it is precluded by officer safety, a verbal warning is given prior to deployment and a supervisor's approval is obtained. Agencies should train their canines to follow the approach of "find and bark," rather than "find and bite."

DOJ Ohio April 12, 2002
The policy will require that in all circumstances where a canine is permitted to bite or apprehend a suspect by biting, the handler will call off the dog at the first possible moment the canine can be safely released, taking into account that the average person will struggle if being seized or

confronted by a canine and the policy will specify that struggling alone, will not preclude the release of the canine. The policy will prohibit canines from biting nonresistant subjects. Whenever a canine-related injury occurs, immediate medical treatment either by rescue ambulance, transportation to an emergency room, or admission to a hospital must be sought. The policy will require the CPD to track canine deployments and canine apprehensions and to calculate and track canine bite ratios on a monthly basis to assess its canine unit and individual canine teams.

I declare under penalty of perjury under the laws of the United States of America, State of Montana, County of Sanders, that the foregoing is true and correct.

Very truly yours,

Ernest Burwell,